******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* RAASHON JACKSON
## (AC 40433)

Lavine, Alvord and Beach, Js.

*Syllabus*

Convicted of the crimes of murder, conspiracy to commit murder and assault in the first degree in connection with a shooting, the defendant appealed, claiming, inter alia, that the trial court deprived him of a fair trial and his right to present a defense when it denied his motion in limine to preclude certain testimony of W, the state's expert witness, pertaining to cell phone site location data. The defendant and R, who also was involved in the shooting, were tried jointly to a jury. R's cousin, A, had driven the defendant and R to and from the scene of the shooting. The state had retained W to analyze certain global positioning system and cell phone data to determine the locations of the defendant, R and A at the time of the shooting. During jury selection seven days before trial, the state disclosed to the defense a PowerPoint presentation that W had created. The court denied the defendant's motion in limine to preclude W's testimony, concluding that the state had not acted in bad faith in making the late disclosure and that the defendant had not been prejudiced. The court also denied the defendant's request for a six week continuance so that he could consult with an expert of his own. *Held*:

1. The trial court did not abuse its discretion in denying the defendant's motion in limine to preclude W from testifying or in denying the defendant's request for a six week continuance to consult with his own expert: that court determined that the state had not acted in bad faith, nor did the defendant claim bad faith by the state, defense counsel, in clarifying the issues that were the basis for the motion, stated that he was concerned about a portion of W's PowerPoint presentation that contained hearsay, which the court ultimately precluded, and given that twenty-one days had elapsed between the state's disclosure of the PowerPoint presentation and W's testimony, the court reasonably could have concluded that a six week continuance would have been too disruptive to the trial; moreover, defense counsel failed to renew his request for a continuance at the conclusion of the state's direct examination of W, the denial of a continuance was not so arbitrary as to vitiate logic and was not based on improper or irrelevant factors, and although the court improperly determined that the defendant was not prejudiced, as the defendant was prevented from potentially presenting the testimony of his own expert, the court ameliorated the prejudice by precluding a portion of W's PowerPoint presentation that defense counsel claimed contained hearsay, and by permitting defense counsel to confer with W regarding changes to the PowerPoint presentation, and defense counsel conducted an effective cross-examination of W; furthermore, even if the court abused its discretion, the defendant failed to demonstrate that the claimed error was harmful, as the state's case against him was relatively strong, W's testimony was corroborative of other testimony, and the jury viewed surveillance video and still images from the crime scene, as well as photographs and a text message from R that were recovered from the defendant's cell phone.

2. This court declined to review the defendant's unpreserved evidentiary claim that the trial court improperly permitted W to testify without first conducting a hearing pursuant to *State* v. *Porter* (241 Conn. 57) as to his qualifications and the reliability of his methodology: the defendant failed to request a *Porter* hearing, he conceded to the trial court that the evidence W offered was admissible through a proper expert and requested to voir dire W only as to his qualifications, and although this court has recognized that the rule set forth in *State* v. *Edwards* (325 Conn. 97)—that a police officer must be qualified as an expert witness before testifying about cell phone data and that cell phone data evidence is of a scientific nature requiring a *Porter* hearing—is retroactively applicable to pending cases, that did not compel the conclusion that an evidentiary claim made pursuant to *Edwards* is reviewable where, as here, the claim is unpreserved; accordingly, because the defendant failed

to request a *Porter* hearing, his unpreserved evidentiary claim that the trial court erred in failing to hold a *Porter* hearing was not reviewable.

3. The trial court did not abuse its discretion in precluding the defendant from presenting testimony from his investigator to rebut W's testimony; it was not clear from defense counsel's proffer whether the investigator had sufficient knowledge regarding the cell site accessed by the defendant's phone, defense counsel did not request a hearing outside the presence of the jury to proffer the investigator's testimony or inform the trial court that he intended to rely on certain of W's conclusions, and defense counsel's proffer did not include whether the investigator had knowledge as to the geographical coverage area of the cell site at issue.

4. The defendant could not prevail on his claim that he was deprived of his right to present a defense when the trial court prevented him from introducing evidence that a gun used in the shooting had been found one year later on a person who was unrelated to the shooting; the trial court did not abuse its discretion in concluding that the proffered evidence was too remote in time to be relevant to show a lack of identity of the defendant as one of the shooters, as the court reasonably could have concluded that the fact that the weapon was found in the possession of a different individual almost one year after the crimes at issue did not render it either certain or more probable that the defendant was not one of the shooters.

5. The trial court did not abuse its discretion in admitting certain consciousness of guilt evidence concerning the defendant's failure to appear in court on unrelated matters subsequent to the shootings: the jury reasonably could have inferred that the defendant's failure to appear could have been influenced by his involvement in the shootings and indicated a consciousness of guilt in the shooting incident, and the evidence of his failure to appear was not more prejudicial than probative, as there was nothing in the record to indicate that it created a side issue that unduly distracted the jury, no significant amount of time was expended on the issue, and the jury reasonably could have inferred from a text message sent by R to the defendant that the defendant was aware that the police might seek him out in connection with the shootings; moreover, even if the defendant had presented evidence that he failed to appear in court because he had fled from the scene of an accident in which the police found a gun in the car he had been operating, the jury was entitled to make contrary inferences, and even if the court had considered the transcript of a prior proceeding in which defense counsel made representations about his unsuccessful efforts to contact the defendant about his failure to appear in court, the transcript did not compel the conclusion that the defendant did not have notice of the court date.

Argued January 29—officially released July 24, 2018

*Procedural History*

Substitute information charging the defendant with four counts of the crime of assault in the first degree, and with the crimes of murder, conspiracy to commit murder and criminal possession of a firearm, brought to the Superior Court in the judicial district of Fairfield, where the court, *Kavanewsky, J.*, granted the defendant's motion to sever the charge of criminal possession of a firearm; thereafter, the court granted the state's motion to consolidate the case for trial with that of another defendant; subsequently, the matter was tried to the jury; thereafter, the court denied in part the defendant's motion to preclude certain evidence, and denied the defendant's motions for a continuance and a mistrial, and to introduce certain evidence; verdict of guilty; subsequently, the court denied the defendant's motion for a judgment of acquittal or a new trial; thereafter, the state entered a nolle prosequi as to the charge of criminal possession of a firearm, and the court ren-

dered judgment in accordance with the verdict, from which the defendant appealed. *Affirmed*.

*Pamela S. Nagy*, assistant public defender, for the appellant (defendant).

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, *C. Robert Satti*, *Jr.*, supervisory assistant state's attorney, and *Pamela J. Esposito*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Raashon Jackson, appeals from the judgment of conviction, rendered after a jury trial, of one count of murder in violation of General Statutes § 53a-54a (a), one count of conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a) and 53a-54a (a), and four counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (5). On appeal, the defendant claims that the trial court: (1) abused its discretion and deprived him of his rights to a fair trial and to present a defense when it denied his motion to preclude the testimony of the state's belatedly disclosed expert witness and refused to afford him a continuance to retain his own expert, (2) abused its discretion in admitting the testimony of the state's expert without conducting a *Porter* hearing,[1] (3) abused its discretion and deprived him of his right to present a defense when it excluded exculpatory evidence in the form of his investigator's testimony, (4) deprived him of his right to present a defense when it excluded exculpatory evidence regarding the discovery of a gun used in the crimes, and (5) abused its discretion in admitting certain consciousness of guilt evidence and instructing the jury as to that evidence. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. On September 10, 2013, Roderick Rogers called his cousin, David Anderson, seeking a ride. At 2:10 p.m., a social worker, William Muniz, went to Rogers' house in Bridgeport to discuss a job opportunity. Rogers told Muniz that he had to go somewhere but could be back in one hour. Muniz asked that Rogers call him when he returned home. As Muniz was leaving, Anderson was arriving. Anderson was on probation at the time, and his movements were tracked by a global positioning system (GPS) device he wore on his ankle.

Anderson and Rogers left the house together, and Rogers directed Anderson to drive toward Palisade Avenue, a street a couple of blocks away from Rogers' house. After turning on Palisade Avenue, Rogers saw the defendant, who was a friend called Red Dreads. Anderson stopped the car, and the defendant got in on the rear passenger side. Rogers told Anderson to drive from the east side of the city to the "Terrace," located in the north end of Bridgeport. After turning into the Terrace, Rogers directed Anderson to turn around, park on a side street off Reservoir Avenue, and wait because he and the defendant would be right back. Rogers asked Anderson if he had an extra shirt, and Anderson told him to check the trunk. Rogers and the defendant got out of the car, went to the open trunk, shut the trunk, and walked down a hill.

At the time, a group of young men was gathered

outside the Beardsley Terrace public housing complex. Rogers and the defendant approached the group and said, "y'all just came through the Ave shooting Braz, you all f'd up,"[2] and began shooting. Rogers and the defendant then ran off with the weapons in their hands. They returned to Anderson's car, and Rogers told Anderson to drive back down Reservoir Avenue. They drove to the corner of Stratford Avenue and Hollister Avenue, and Anderson parked the car. The defendant told Rogers he thought he had dropped a clip. After opening and shutting the car door, the defendant got out of the car, and walked toward Stratford Avenue. Anderson then drove Rogers home. Rogers called Muniz at 2:46 p.m., and Muniz returned to Rogers' home by 3 p.m.

Seven shell casings were recovered from the scene, and forensic analysis revealed that four were fired from one gun and three were fired from a different gun. One of the victims, LaChristopher Pettway, died from a gunshot wound to his mid-left back. Four others sustained gunshot wounds, including Tamar Hamilton, who was shot in the heel; Leroy Shaw, who was shot in the arm; Jauwan Edwards, who was shot in the buttocks; and Aijholon Tisdale, who was shot in the upper thigh. On September 16, 2013, Rogers was arrested. That day, Rogers sent a text message to the defendant indicating that "[d]ey taken [me]."

On March 10, 2014, the defendant was arrested. He was charged in the operative information with murder, conspiracy to commit murder, and four counts of assault in the first degree.[3] Upon the state's motion, the defendant's case was consolidated for trial with that of Rogers. After the presentation of evidence, a jury found the defendant guilty on all counts of the information.[4] The jury also answered "yes" to a set of written interrogatories indicating that the state had proven beyond a reasonable doubt that the defendant used a firearm during the commission of each crime. The defendant was sentenced to a total effective term of fifty-five years of incarceration. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that he was "deprived of a fair trial and of his right to present a defense when the court denied his motion to preclude the testimony of [Hartford Police Sergeant Andrew] Weaver." The defendant contends in the alternative that "[e]ven if the court's decision not to preclude Weaver's testimony was proper, it was certainly an abuse of discretion to deny a reasonable continuance for [the] defendant to consult with an expert." In a supplemental brief, the defendant further claims that "[t]he trial court abused its discretion when it allowed . . . Weaver to testify as an expert without ever conducting a *Porter* hearing to determine if he was qualified to testify as an expert

and whether the methodology he used to support his opinion that [the] defendant was in the same location as Anderson and Rogers at the time of the crime was reliable." See footnote 1 of this opinion.

The following additional facts and procedural history are relevant to these claims. The defendant served a request for disclosure on the state in April, 2014, and filed a "motion for disclosure and hearing re: state's expert witnesses" dated April 21, 2015. In his motion, the defendant sought, inter alia, disclosure of the names of each expert witness the state intended to call at trial and the opinions to which each witness was expected to testify. The court addressed the motion during a hearing on April 29. The defendant anticipated that the state might offer an expert with respect to "pin-point[ing] cell phones relative to towers and things like that," and stated that it was "unclear" what that expert's opinion may be with respect to the defendant's cell phone. The defendant anticipated that if the state disclosed an expert on this issue, he might file a motion in limine. The court responded: "Okay. So, what you're asking for is, if the state's going to call an expert to give opinion evidence about the proximity of [the defendant's] cell phone to a tower somewhere that you [would] like to know who that is and [what] they're going to say?" The defendant confirmed that was the disclosure he sought, and the state responded that it had no objection to providing that information, but stated that it "can't definitively say who that might be at this time because we're still analyzing the data . . . ." The court responded: "But, I mean, if you selected somebody and they say, look, in my opinion, this cell phone was within, like, 100 feet of this tower . . . which is on this building, you'll disclose that to the defense?" The state replied that it would do so.

Jury selection began on August 3, 2015. On that date, the state provided the defendant with a list of potential witnesses that included Weaver's name under the heading of Hartford Police Department, but did not identify him as an expert witness. Throughout jury selection, the state identified Weaver to venire panels as a potential witness. On October 1, 2015, seven days before evidence began and while jury selection was still ongoing, the state provided the defendant with Weaver's resume and a file containing a PowerPoint presentation Weaver created. On October 7, the defendant filed a motion in limine seeking to preclude Weaver's testimony, specifically as it related to cell site location information, or, in the alternative, "a reasonable continuance in order that a defense expert may be retained (e.g., apply for and obtain funding authorization from the Office of the Chief Public Defender, allow for expert's review of necessary materials, etc.)". The defendant argued that he had not been provided foundational information for Weaver's opinion, and that the late disclosure caused him undue prejudice. The defendant claimed that he

needed to hire his own expert, and that he could not identify, hire, and obtain funding for an expert, provide the potential expert with the material for review, and confer with the expert in the presentation of the defendant's defense in the short time before evidence was set to begin.

The court held a hearing on the defendant's motion in limine on October 20, 2015. The court referred to the defendant's argument regarding the state's late disclosure of Weaver and then stated: "Also, from a more substantive point of view, I understand the motion in limine to say this . . . that Sergeant Weaver purportedly used . . . two devices or sets of data or software programs—I'm not sure how to characterize them— that the defense feels are problematic. One is cell tower related information that is accessible to law enforcement, and that's referenced in the moving papers. Accessible to law enforcement and it's not reflected on the data that's been produced pursuant to subpoena and witnesses here in court. And that [the] other is the use of what I'm just going to call a GeoTime . . . computer program. . . .

"[T]hose are really the issues that I'm trying to give the short version of [w]hat I see the defense raising as problematic. And what I would like to do is to approach it this way. Let me just say one more thing. The other area, in fairness to the defense, is the reliability of this GeoTime software and whether Sergeant Weaver is qualified as an expert to do what he's done. I think that fairly covers everything."

Defense counsel then responded: "Just two things, Your Honor. In terms of sergeant—well, I guess it's related. In terms of Sergeant Weaver's qualifications to testify as an expert and the state's memorandum in opposition, which seems to focus largely on the issue of whether or not the proffer[ed] purpose of Sergeant Weaver's testimony was generally inadmissible . . . I don't think we ever really contested that this type of information can be presented to a jury if coming in through a proper expert. And in terms of Sergeant Weaver's qualifications, we would just like to voir dire him during his testimony if he's allowed to testify. So, that's not really a basis. And then also—and I think there was one issue. . . . One issue that we see as substantive with respect to the—to the PowerPoint presentation slideshow that he—that Sergeant Weaver has presented to us for review, and that is in particular the second page, which is that entire summary page."

Defense counsel then called Weaver to the witness stand. Weaver testified that the state's attorney's office had contacted him "two to three weeks ago" to inquire whether he would be willing to assist with a case in Bridgeport. The state's attorney's office sent Weaver hard copies and compact discs (CDs) of call detail records from three carriers: AT&T (for a cell phone

number the state associated with Anderson), Sprint PCS (for a cell phone number the state associated with the defendant), and Metro PCS (for a cell phone number the state associated with Rogers). Weaver learned that the Metro PCS records contained the wrong set of tower information, and he downloaded the correct tower information from the National Cellular Assistance Data Center (NCADC) in the form of an Excel spreadsheet.[5] Weaver included that spreadsheet on the CD he created, made a second copy for the defense, and advised the state attorney's office that the records were ready. Weaver also e-mailed the PowerPoint presentation to the state. The state never picked up the two copies of the CD and told Weaver that it believed that it had the information it needed.

After the conclusion of Weaver's testimony during the hearing on the motion in limine, defense counsel argued that the state violated Practice Book § 40-11 by failing to disclose Weaver.[6] Defense counsel further argued that he had never received the CDs Weaver prepared, which contained the cell tower records in the form of an Excel spreadsheet and a version of the PowerPoint presentation that contained a video, rather than a still image.[7] Reciting his efforts to obtain an expert even in the absence of the underlying tower data, defense counsel argued that he had been prejudiced in his ability to meaningfully challenge Weaver's testimony. Defense counsel requested that the court preclude Weaver's testimony, or in the alternative, grant him a reasonable continuance of at least six weeks.

The state explained that it had understood the court's April 29, 2015 order to require the state to disclose expert opinion evidence once the state received it. The state claimed that it provided Weaver's name on August 3, and that the "very first research of Sergeant Weaver by the Internet would give certainly an indication as to what he does." The state further responded that as soon as it became aware of Weaver's testimony in a Milford case, it provided the transcript to the defendant. The state claimed that it did not meet with Weaver until the "end of September" because it was in the process of jury selection for this trial and that another trial was going forward. With respect to the CDs, the state stated that it had "no answer" to explain why they were not picked up or disclosed, and represented that it had not seen them.

With respect to prejudice, the state argued that it had "provided information from this file" early on in the case, that "everybody knew the cell phone evidence was clearly in this case and it was part of the investigation certainly from the early stages," and that defense counsel knew Anderson wore a GPS bracelet. In response to a question from the court regarding why the state delayed in retaining and meeting with Weaver, the state responded that both the state and defense counsel were

preparing for other trials, and that in June, 2015, this case had been postponed until August.

In an oral ruling, the court stated: "[T]he problem I'm having is, while I know that we are all busy people, I don't think it's a fair interpretation of what the Practice Book requires and what the court orders were in this case to say that, okay, as soon as we have it we'll give it to you notwithstanding when we have it. I mean, what does that mean? Now, that would mean that you engage an expert and you have the product that you intend to offer through him the date before the evidence starts. I know that didn't happen here, but the product was delivered in October, October the first or thereabouts and the evidence started on October the eighth. I just don't—you know, these obligations for disclosure, which were filed, [somewhat] generic, others were much more specific made months ago. And while I don't disagree with the state that this type of evidence cannot be said to be unanticipated, the problem is that until the defense knows . . . what the state is going to present . . . it can't prepare to, you know, meet that evidence by either consulting other experts or retaining other experts or what have you. That's the problem I have. That's the problem I have here.

"I'm not saying that there was bad faith involved. I'm just saying that notwithstanding our schedules, I believe that . . . this was all an avoidable situation. You know, had—or have we been pressed, you know, the state could well have said, Your Honor, I need two days off from jury selection to go meet with expert so and so to see if we're going to use him, and that didn't happen. I'm . . . just troubled by the way that this all unfolded. Again, not that there was bad faith involved, but this was . . . in my mind, an avoidable situation."

In concluding that the defendant had not suffered prejudice, the court explained that "what the state intends to present here by way of cell phone evidence, the movement of these phones and . . . the GPS, is not what I would call a . . . matter that is so novel or cutting edge or unusual that the defendant would suffer prejudice as a result of allowing its use here in court in testimony through the witness." The court accordingly denied the defendant's motion in limine, but precluded from evidence two slides of Weaver's PowerPoint presentation, one depicting the video the defendant had never received; see footnote 7 of this opinion; and another containing hearsay. Defense counsel inquired whether the court also was denying the defendant's request for a continuance, to which the court replied that it was and that "[y]ou can renew your motion if you need be at the . . . end of direct. But based upon what I've heard so far, been presented with so far, I'm denying the request for a continuance." The defendant then moved for a mistrial, which the court denied.

Defense counsel also requested a copy of the Excel

spreadsheet, and the state indicated that it was copying the CDs to provide to the defendant. The state further indicated that Weaver was returning to his office to redact the precluded information. The next afternoon, before Weaver was set to testify before the jury, defense counsel informed the court that in addition to making redactions to the PowerPoint presentation, Weaver had made other revisions, including changing the representation of cell site coverage areas from ovals to pie wedges, which had the effect of narrowing the coverage areas. The court ordered a ten minute recess to allow defense counsel to confer with Weaver regarding the changes. Back on the record, defense counsel stated that although he had a better understanding of the changes, he was still unclear as to the reason for them. Defense counsel renewed his requests for preclusion and for a mistrial. In the alternative, the defendant sought a continuance in order to obtain the transcript from the prior day's hearing, or at a minimum, a continuance "until tomorrow to have an opportunity to digest all this material" and prepare for cross-examination the following day. Defense counsel noted that the state had given him CDs the day before, but that the CDs were not responsive to the defendant's requests and that new CDs provided that morning had not yet been reviewed by defense counsel. The court granted a continuance until the following morning and asked defense counsel whether he believed that time to confer with Weaver would be useful to him, to which defense counsel replied that he did. The court ordered Weaver to remain available to defense counsel from the time it adjourned, which appeared to be sometime after 4 p.m., until 4:45 or 4:50 p.m. The court further ordered the state to provide any of Weaver's spreadsheets that it had not yet provided to defense counsel.

The next morning, defense counsel informed the court that he had spent twenty minutes or one-half hour with Weaver, who "provided some clarification relative to the changes in his presentation." For the reasons that he previously had offered, the defendant then renewed his objection to the state's late disclosure of Weaver. Defense counsel stated: "But specific as to the changes, I can't say to the court that I'm not prepared to go forward today and address those changes as needed." He further implied that the revision to the PowerPoint presentation "just magnifies the import of the prejudice to [the defendant] relative to not being able to get our own expert." The court inquired of defense counsel whether "these changes in the report impair your ability to cross-examine the witness to any greater extent [than] you feel you may have been impaired when you first made the motion to preclude . . . ." Defense counsel responded that they did not and represented to the court that he felt prepared to go forward.

Evidence then resumed, and the state called Weaver

to the witness stand. After inquiring as to Weaver's experience and background, the state introduced Weaver's PowerPoint presentation into evidence. Defense counsel conducted a voir dire as to the PowerPoint presentation, and ultimately did not object to the presentation. Weaver testified that the states attorney's office had provided him with logs for Anderson's GPS device and call detail records for three phone numbers, and had asked him to map the location of Anderson's GPS and phone calls made and received for two of the phone numbers, which the state attributed to Rogers and the defendant. Using software called GeoTime, Weaver mapped these locations, which were depicted on the maps as a person figure in the center of 120 degree pie shaped coverage areas. Weaver's presentation contained fifteen different snapshots of maps and descriptions indicating Anderson's GPS location and whether the defendant's or Rogers' cell phone connected to a cell site with a "generally expected coverage area" in which Anderson's GPS was also located.

Snapshots nine through thirteen showed that the defendant's phone connected to a cell site whose coverage area included Anderson's GPS. Specifically, snapshot nine depicted the defendant's phone connected to a cell site whose coverage area included the location of the shootings. Snapshot thirteen depicted Rogers' and the defendant's phones connected to a cell site that included the area of Stratford Avenue and Hollister Avenue, where Anderson's GPS was also located. Weaver opined that the "phones moved together or met with before and/or after . . . the [victim's] murder. They either traveled to or traveled from. [Rogers' phone] moved toward the [victim's] murder with the Anderson GPS. And the [defendant's] phone, the 6819 number, moved away and then when they actually made phone calls all together . . . within this area of Stratford and Hollister after the homicide."

At the conclusion of Weaver's direct examination, defense counsel did not renew the defendant's request for a continuance. On cross-examination, defense counsel questioned Weaver about a call made from Rogers' phone to the defendant's phone at 2:14 p.m. Weaver testified that he did not map the 2:14 p.m. call because the state's attorney's office had asked him only to plot the locations when the two phones were together, and the two phones were not together at the time of that call. Weaver also testified that he did not include any other cell sites in the area, and thus, his presentation did not depict any coverage overlap between towers. Last, Weaver's snapshots did not depict the movement of the phones.

On December 18, 2015, the defendant filed a motion for a judgment of acquittal or, in the alternative, a new trial. In his memorandum of law in support of the motion, the defendant claimed that the state's failure

to timely disclose Weaver, and the court's failure to preclude Weaver's testimony or afford the defendant a reasonable continuance to retain his own expert, deprived the defendant of a fair trial. The court heard oral argument on January 22, 2016, and denied the defendant's motion.

A

We first address the defendant's claim that the court erred in permitting Weaver to testify and denying the defendant's alternative request for a six week continuance in order to permit him to retain his own expert. The defendant claims that the trial court's ruling constituted an abuse of discretion, and further, that it deprived him of a fair trial and of his right to present a defense.

We begin our analysis with the applicable legal principles and standard of review. Chapter 40 of the Practice Book governs discovery in criminal cases. Section 40-5 of the rules of practice provides in relevant part: "If a party fails to comply with disclosure as required under these rules, the opposing party may move the judicial authority for an appropriate order. The judicial authority hearing such a motion may enter such orders . . . as it deems appropriate, including . . . (2) Granting the moving party additional time or a continuance . . . (4) Prohibiting the noncomplying party from introducing specified evidence . . . (5) Declaring a mistrial . . . [or] (8) Entering such other order as it deems proper." See also *State* v. *Rabindranauth*, 140 Conn. App. 122, 135–36, 58 A.3d 361 (affirming trial court's preclusion of defense expert's testimony as sanction for late disclosure where defendant failed to comply with court's order requiring disclosure of expert witnesses by December 17, 2010, and did not disclose expert until January 3, 2011, one day before commencement of evidence), cert. denied, 308 Conn. 921, 62 A.3d 1134 (2013).

Practice Book § 40-5 gives "broad discretion to the trial judge to grant an appropriate remedy for failure to comply with discovery requirements." *State* v. *Wilson F.*, 77 Conn. App. 405, 417, 823 A.2d 406, cert. denied, 265 Conn. 905, 831 A.2d 254 (2003). This court previously has held that the "court must consider appropriate sanctions, but is under no obligation to impose a penalty." Id., 419. "Generally, [t]he primary purpose of a sanction for violation of a discovery order is to ensure that the defendant's rights are protected, not to exact punishment on the state for its allegedly improper conduct. As we have indicated, the formulation of an appropriate sanction is a matter within the sound discretion of the trial court." (Internal quotation marks omitted.) *State* v. *Beaulieu*, 118 Conn. App. 1, 8–9, 982 A.2d 245, cert. denied, 294 Conn. 921, 984 A.2d 68 (2009).

"In determining what sanction is appropriate for failure to comply with court ordered discovery, the trial

court should consider the reason why disclosure was not made, the extent of prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances. . . . As with any discretionary action of the trial court, appellate review requires every reasonable presumption in favor of the action, and the ultimate issue for us is whether the trial court could have reasonably concluded as it did." (Citations omitted; internal quotation marks omitted.) *State* v. *Cooke*, 134 Conn. App. 573, 578–79, 39 A.3d 1178, cert. denied, 305 Conn. 903, 43 A.3d 662 (2012). "In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." (Internal quotation marks omitted.) *State* v. *Beaulieu*, supra, 118 Conn. App. 8.

First, with respect to the defendant's claim that the court erred in not precluding Weaver's testimony, we conclude that the trial court did not abuse its discretion. We note that even in circumstances where the state has committed a discovery violation, "[s]uppression of relevant, material and otherwise admissible evidence is a severe sanction which should not be invoked lightly." (Internal quotation marks omitted.) *State* v. *Cooke*, supra, 134 Conn. App. 579; see also *State* v. *Hamlett*, 105 Conn. App. 862, 874, 939 A.2d 1256 (denial of proposed remedy of exclusion of police officer's field notes, which were not previously disclosed to defense and which affected defense strategy of contradicting victim through police report, was not abuse of discretion), cert. denied, 287 Conn. 901, 947 A.2d 343 (2008). Moreover, when the court offered its understanding of the defendant's challenges to Weaver's qualifications and the reliability of the software he used, defense counsel replied that those issues were not the bases for his motion and that he only wanted to voir dire Weaver as to his qualifications. Substantively, defense counsel clarified that he was concerned about a portion of Weaver's PowerPoint that contained hearsay, and the court ultimately precluded that portion.

We further conclude that the court did not abuse its discretion in denying the defendant's alternative request for a six week continuance to consult with an expert. With respect to circumstances of the untimely disclosure, although the court described the late disclosure as an "avoidable situation," the court determined that the state had not acted in bad faith. Moreover, the defendant had not claimed that the state had acted in bad faith, describing the focus of his motion to preclude as "the late disclosure on accident by the state." See *State* v. *Respass*, 256 Conn. 164, 188, 770 A.2d 471 ("because the noncompliance in this case was inadvertent . . . and there was no prejudice to the defendant, the trial court did not abuse its discretion by denying the defendant's motion to suppress the statement" [citation

omitted]), cert. denied, 534 U.S. 1002, 122 S. Ct. 478, 151 L. Ed. 2d 392 (2001).

Regarding prejudice to the defendant, the court concluded that there had not been "a true prejudice visited upon the [defendant] by these circumstances." The court's prejudice analysis focused on the substance of Weaver's testimony, with the court concluding that the proffered evidence was not "so novel or cutting edge or unusual that the defendant would suffer prejudice . . . ." That analysis overlooks the result of the late disclosure, which was that the defendant was prevented from consulting with, and potentially presenting the testimony of, his own expert. Thus, it is clear that the defendant suffered some measure of prejudice as a result of the late disclosure. The court did take certain steps to ameliorate the prejudice to the defendant, including precluding one slide of Weaver's presentation that contained a previously undisclosed video and recessing for the afternoon in order to permit defense counsel to confer with Weaver regarding changes to Weaver's presentation.

Although the late disclosure deprived the defendant of the opportunity to consult with his own expert, defense counsel conducted an effective cross-examination of Weaver. See *State* v. *Cooke*, supra, 134 Conn. App. 580 (noting, in concluding that court did not abuse its discretion in granting two day continuance for defense counsel to prepare to cross-examine expert regarding supplemental DNA report, that "the defendant was able to raise and did raise challenges to the credibility of the DNA results during his cross-examination"). In the present case, defense counsel was able to elicit testimony that the defendant's and Rogers' phones were not together when Rogers called the defendant at 2:14 p.m., shortly before the shootings. Weaver also testified that he did not include any other cell sites in the area, and thus, his presentation did not depict any coverage overlap between towers or anything else that might affect the signals or coverage area.[8]

Having determined that the defendant was not prejudiced by the state's late disclosure, the court had no occasion to analyze the feasibility of rectifying any prejudice by a continuance. Although we recognize that the requested continuance likely would have cured any then existing prejudice to the defendant as a result of the late disclosure; see *State* v. *Van Eck*, 69 Conn. App. 482, 498–99, 795 A.2d 582 (court did not abuse discretion in electing to continue matter for almost one month for defendant to obtain records, which were not previously disclosed to him), cert. denied, 260 Conn. 937, 802 A.2d 92, and cert. denied, 261 Conn. 915, 806 A.2d 1057 (2002); we are mindful that granting the six week continuance requested would have caused a substantial disruption to the trial. The state provided Weaver's PowerPoint presentation to defense counsel on October

1, 2015, while jury selection was ongoing. Jury selection was initially completed on October 7, 2015, the day the defendant filed his motion to preclude. On the morning of October 8, the court conducted additional voir dire after one of the jurors was excused, and evidence began that afternoon. The hearing on the motion to preclude was not held until October 20, 2015. By that date, the court already had held seven days of trial, and a lengthy continuance certainly would have affected all involved in the trial, including the jury. See *State* v. *Brown*, 242 Conn. 445, 460, 700 A.2d 1089 (1997) (trial court took into consideration "the length of the requested continuance and its potentially negative effect on the jury" and thus did not abuse its discretion in denying motion for continuance). By October 22, when Weaver testified before the jury, twenty-one days had elapsed since the state's disclosure, and the court reasonably could have concluded, had it reached the feasibility of rectifying the prejudice by a continuance, that a six week continuance would have been too disruptive to the trial.

The state argues in its brief that the trial court did not abuse its discretion in declining to order a continuance because the defendant abandoned his request for a continuance. The state underscores the court's instruction to defense counsel that "[y]ou can renew your motion if you need be at the . . . end of direct," and defense counsel's failure to do so at that time.[9] In *State* v. *Sewell*, 95 Conn. App. 815, 819, 898 A.2d 828, cert. denied, 280 Conn. 905, 907 A.2d 94 (2006), this court considered the defendant's claim that the trial court improperly denied his motion for a mistrial on the basis of the state's failure to provide material regarding the content of a witness' testimony. Concluding that the trial court had not abused its discretion, this court considered that the trial court had "ordered a one day continuance and indicated that it would allow defense counsel more time if requested." Id., 821. The following day, defense counsel did not request additional time, and this court concluded that "the continuance the [trial] court granted was a curative action offered to remedy any then existing prejudice to the defendant." Id.; see also *State* v. *Cooke*, supra, 134 Conn. App. 580 (noting, in analysis of whether trial court abused its discretion in denying motion to preclude and granting shorter continuance than requested to prepare for cross-examination of expert witness regarding supplemental DNA report disclosed on first day of evidence at trial, that on day that court ultimately scheduled cross-examination, "the defendant did not object on the basis of a lack of time or ability to have his expert review the supplemental report, and the court explicitly asked both parties' counsel whether they wanted to be heard on any matter, to which both replied in the negative").

We do not construe the defendant's failure to repeat his request for a continuance at the conclusion of Weaver's direct examination as an abandonment of that

request. We believe it relevant, however, to the discussion of whether the court abused its discretion, in that the court expressly identified the conclusion of direct examination as an appropriate opportunity for defense counsel to renew his request, and defense counsel failed to renew his request at that moment.

The question of whether the court abused its discretion in failing to order a continuance in order to permit the defendant to consult with his own expert witness is a close one. We disagree with the trial court that the defendant suffered no prejudice as a result of the late disclosure. Ultimately, however, we cannot conclude that the court's ruling denying the request for a six week continuance was "so arbitrary as to vitiate logic" or was "based on improper or irrelevant factors." (Internal quotation marks omitted.) *State* v. *Beaulieu*, supra, 118 Conn. App. 8. We note that the trial court did sanction the state for its late disclosure, although the sanction issued was mild in comparison to that requested by defense counsel.[10] Accordingly, we conclude that the court did not abuse its discretion.[11]

We further conclude that even if the court's denial of the defendant's request for a continuance constituted an abuse of discretion, the defendant has not demonstrated that the claimed error was harmful. "[W]hether [an improper ruling] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error." (Internal quotation marks omitted.) *State* v. *Toro*, 172 Conn. App. 810, 817, 162 A.3d 63, cert. denied, 327 Conn. 905, 170 A.3d 2 (2017). "[A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Pascual*, 305 Conn. 82, 93, 43 A.3d 648 (2012).

In the present case, Weaver's testimony, although important to the state's case, also was corroborative of other testimony presented to the jury. The jury heard Anderson's detailed description of the events on the day of the shootings. Anderson identified the defendant as the man he picked up on Palisade Avenue on the afternoon of the shootings. Anderson testified that he dropped the defendant and Rogers off near the scene of the shootings and heard "firecracker sounds" while

they were gone. Surveillance videos further corroborated much of Anderson's testimony, including that the defendant told Rogers he thought he had dropped a clip before getting out of Anderson's car at Stratford Avenue and Hollister Avenue. The jury viewed surveillance video and associated still images, which depicted a man opening and closing the rear passenger door of Anderson's car before getting out at Stratford Avenue and Hollister Avenue. The man appeared to have dreadlocks and was wearing a hat with a visible logo. The state entered into evidence photographs recovered from the defendant's cell phone showing the defendant with dreadlocks and wearing a hat with a similar shaped logo; those photographs were taken on September 17, 2013, less than one week following the shootings. The state also entered into evidence a hat matching that worn in the photographs, which was recovered from the defendant's car on September 17, 2013. The jury also heard evidence that on September 16, 2013, Rogers was arrested and had sent the defendant a text message indicating that "[d]ey taken [me]."

Finally, the state's case against the defendant was relatively strong. The jury heard Anderson's testimony, as well as other circumstantial evidence, including that of the defendant's consciousness of guilt. See part IV of this opinion; see also *State* v. *Pugh*, 176 Conn. App. 518, 533, 170 A.3d 710 (concluding that "the state presented a strong case against the defendant, even if some of the evidence was circumstantial"), cert. denied, 327 Conn. 985, 175 A.3d 43 (2017); *State* v. *Hayward*, 116 Conn. App. 511, 520, 976 A.2d 791 (concluding that state's case was strong despite fact that evidence with respect to defendant's use of dangerous instrument was "in large part circumstantial"), cert. denied, 293 Conn. 934, 981 A.2d 1077 (2009). Accordingly, we conclude that even if the court abused its discretion in failing to grant the defendant's request for a continuance, the defendant has not demonstrated that the claimed error was harmful.

B

Following our Supreme Court's decision in *State* v. *Edwards*, 325 Conn. 97, 156 A.3d 506 (2017), the defendant filed a supplemental brief claiming that "[t]he trial court abused its discretion when it allowed Sergeant Weaver to testify as an expert without conducting a *Porter* hearing[12] to determine if he was qualified to testify as an expert and whether the methodology he used to support his opinion that [the] defendant was in the same location as Anderson and Rogers at the time of the crime was reliable." (Footnote added.) The defendant acknowledges that defense counsel did not request a *Porter* hearing, but maintains that the claim is reviewable because of "the presumption of retroactivity" of *Edwards*. The state responds that "[i]t is well established that a question of whether evidence satisfies

the admissibility standards prescribed in *Porter* is a claim 'of evidentiary dimension,' which, if unpreserved, is not entitled to appellate review." We conclude that the defendant's evidentiary claim is unpreserved, and we therefore decline to afford it review.

In *Edwards*, our Supreme Court resolved two issues of first impression when it held that a police officer testifying regarding cell phone data needed to be qualified as an expert witness and that the cell phone data evidence was of a scientific nature such that a *Porter* hearing was required. *State* v. *Edwards*, supra, 325 Conn. 133. In *Edwards*, the defendant had filed a motion in limine "seeking to preclude the admission of cell phone data and requested a hearing pursuant to [*Porter*]." Id., 118. Although our Supreme Court has not yet had occasion to address the question of whether *Edwards* applies retroactively to pending cases, this court twice has recognized that it does. See *State* v. *Turner*, 181 Conn. App. 535, 549 n.13,     A.3d (2018) (stating that *Edwards* "retroactively applies to the present case because 'a rule enunciated in a case presumptively applies retroactively to pending cases' "); *State* v. *Steele*, 176 Conn. App. 1, 34, 169 A.3d 797 (concluding that "*Edwards* is controlling as to this [evidentiary] issue on appeal"), cert. denied, 327 Conn. 962, 172 A.3d 1261 (2017).

In the present case, the defendant did not request a *Porter* hearing. Moreover, when the court took up the defendant's motion in limine and reviewed its understanding of the defendant's issues with respect to the state's late disclosure of Weaver, it stated that "from a more substantive point of view" it understood the defendant's motion to include issues surrounding "the reliability of this GeoTime software and whether Sergeant Weaver is qualified as an expert to do what he's done." Defense counsel responded: "I don't think we ever really contested that this type of information can be presented to a jury if coming in through a proper expert. And in terms of Sergeant Weaver's qualifications, we would just like to voir dire him during his testimony if he's allowed to testify. So, that's not really a basis."

Notwithstanding his failure to request a *Porter* hearing, his concession to the court that the evidence was admissible through a proper expert, and his request to voir dire Weaver only as to his qualifications, the defendant argues on appeal that his evidentiary claim that the court failed to hold a *Porter* hearing is reviewable on the basis of the presumption of retroactivity. He claims that because defense counsel could not have anticipated our Supreme Court's holding in *Edwards*, he "could not have known that a *Porter* hearing was required before Weaver was allowed to testify, and therefore, could not possibly have waived any such claim." In support of this argument, the defendant cites

decisions of our Supreme Court, including *State* v. *Hampton*, 293 Conn. 435, 457, 988 A.2d 167 (2009), in which the court retroactively applied its decision in *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008), to a pending appeal despite the defendant's failure to preserve the constitutional challenge to the trial court's instruction, citing "the general rule that judgments that are not by their terms limited to prospective application are presumed to apply retroactively . . . to cases that are pending . . . ." (Internal quotation marks omitted.) *State* v. *Hampton*, supra, 462 n.16. The defendant provides this court with no authority for the proposition that this general rule extends beyond constitutional challenges to evidentiary claims, and our appellate case law suggests that it does not. See *State* v. *Turner*, supra, 181 Conn. App. 549–50 (declining to review merits of unpreserved claim that defendant's due process right to fair trial was violated by introduction of expert testimony regarding call detail mapping analysis and admission of cell phone coverage maps because claim failed to satisfy *Golding*'s second prong in that it was evidentiary in nature and not of constitutional magnitude).

We conclude that this court's recognition that the rule announced in *Edwards* is retroactively applicable to pending cases does not compel the conclusion that an evidentiary claim made pursuant to *Edwards* is reviewable in the event the claim has not been preserved. See *State* v. *Martinez*, 95 Conn. App. 162, 166 n.3, 896 A.2d 109 (concluding that even if new jury instruction rule announced in *State* v. *Patterson*, 276 Conn. 452, 886 A.2d 777 [2005], which was not of constitutional dimension, was retroactive, this court would decline to review defendant's unpreserved evidentiary claim that trial court failed to give jury instruction regarding credibility of jailhouse informants), cert. denied, 279 Conn. 902, 901 A.2d 1224 (2006); cf. *State* v. *Steele*, supra, 176 Conn. App. 24, 27, 31 (reviewing preserved claim that court improperly permitted lay testimony concerning historic cell site analysis where defendant had objected, inter alia, on ground that officer was " 'getting into the realm of expert testimony' " and had not been qualified as an expert and separately had made a motion to strike testimony regarding " 'cell phone coverage' " because officer was not competent to testify on that topic). Here, because the defendant failed to request a *Porter* hearing, we decline to review the defendant's unpreserved evidentiary claim that the court erred in failing to hold a *Porter* hearing.

## II

The defendant claims that the court deprived him of his right to present a defense by precluding William Smith, the defendant's investigator, from providing testimony to rebut Weaver's testimony.

The following additional facts and procedural history are relevant to this second claim. At the conclusion

of Weaver's testimony on October 22, 2015, defense counsel informed the court that he proposed to offer Smith's testimony regarding the unmapped 2:14 p.m. phone call made from Rogers' phone to the defendant's phone. Noting that he had not been able to retain his own expert because of the state's delayed disclosure, defense counsel represented that Smith had identified the latitude and longitude of the cell site associated with the 2:14 p.m. call in the same call detail records Weaver had used, put the latitude and longitude into Google Maps to plot the location, traveled to that location on the west side of Bridgeport, and photographed the building and the cell site located on top of the building. The court confirmed that the defendant was not seeking a continuance, and defense counsel represented that he could have his witness testify that afternoon. Defense counsel claimed that this evidence would show the defendant's presence on the west side of Bridgeport at the time of the 2:14 p.m. phone call, which made it practically impossible for Anderson to have picked him up minutes later on the other side of town. The state had no objection to the defendant putting on this witness.

The court, however, questioned whether the testimony was "supposed to be representative of something that existed back in 2013 at the time this happened . . . ." The court further inquired whether Smith would "be able to testify the tower was up, that the tower wasn't down for repairs? Is he going to be able to testify about whether this was, you know, the words were one zone or eight zones or three zones?" Defense counsel responded that he thought that Weaver testified that all the relevant towers were three sided. Defense counsel further responded that Smith relied on the same records Weaver used to obtain the latitude and longitude, and had put that information into Google Maps, which he represented that Weaver had testified was an appropriate method to locate a point on a map. The court remarked that defense counsel could not represent that it was the exact tower, to which defense counsel replied: "Is this the tower? I don't know. But it's all I can offer, Your Honor." Defense counsel argued: "And again, I'm prejudiced . . . ."

Accepting defense counsel's representation as to the substance of Smith's testimony, the court stated that even if it were to accept the testimony as true, the court did not think it was "definitive enough, complete enough and material enough to" change its decision regarding a continuance. Defense counsel responded that he understood the court's ruling would not change with respect to the continuance, but that he was attempting to ameliorate the harm occasioned by the court's denial of his motion in limine by introducing evidence of the cell site location associated with the 2:14 p.m. phone call. Defense counsel noted that in the event the court was excluding Smith's testimony, the

defendant would renew his request for a mistrial on the ground that the information as to the 2:14 p.m. phone call was exculpatory and that the failure to disclose it constituted a *Brady* violation.

The court then ruled: "Okay. I don't think it's been shown to be exculpatory. I don't think that it's any cause for a mistrial and you were very effective on cross in eliciting from Sergeant Weaver that the scope of what he was asked to do was very narrow. He could have taken this universe of information he had and done more with it, but I heard from the witness many times that all I was asked to do was to focus on certain dates and times and locations. Times and locations. And that was at the direction of the state. Be it they— they asked him to focus on what he acknowledged to be a much greater, you know, source—sources that are available to him. So, I understand that." In his memorandum of law in support of his motion for a new trial, the defendant argued that the court's preclusion of Smith's testimony constituted material error warranting a new trial.

"[T]he federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment . . . [guarantees] the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . When defense evidence is excluded, such exclusion may give rise to a claim of denial of the right to present a defense. . . . A defendant is, however, bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes." (Internal quotation marks omitted.) *State* v. *Sampson*, 174 Conn. App. 624, 635, 166 A.3d 1, cert. denied, 327 Conn. 920, 171 A.3d 57 (2017). "[T]he proffering party bears the burden of establishing the relevance of the offered testimony. Unless a proper foundation is established, the evidence is irrelevant." (Internal quotation marks omitted.) *Deegan* v. *Simmons*, 100 Conn. App. 524, 540, 918 A.2d 998, cert. denied, 282 Conn. 923, 925 A.2d 1103 (2007).

We conclude that the court did not abuse its discretion in precluding Smith's testimony. Although the basis the court relied on in precluding Smith's testimony was not clearly articulated, the court's questions to defense counsel were addressed to the foundation for Smith's testimony. It was not clear from defense counsel's proffer whether Smith had sufficient knowledge to be examined and cross-examined regarding the cell site accessed by the defendant's phone, and defense counsel

did not request a hearing outside of the presence of the jury to proffer Smith's testimony. Nor did he inform the court that he intended to rely on certain of Weaver's conclusions with respect to the generally expected coverage area of the cell site. Specifically, although defense counsel sought to introduce Smith's testimony as to the location of the cell site to which the defendant's cell phone connected, defense counsel's proffer did not include whether Smith had any knowledge as to the geographical coverage area of the cell site in question. Accordingly, in light of the limited foundation, we conclude that the court did not abuse its discretion in precluding Smith's testimony.[13]

### III

The defendant next claims that the court deprived him of his "right to present a defense when it prevented him from introducing highly relevant information that one of the guns used in the shooting was found on a person named Terrance Clark when he was arrested in August, 2014." The defendant claims that "[t]his was the only evidence connecting a particular gun to the shooting and, significantly, it was not connected to the defendant."

The following additional facts and procedural history are relevant to this claim. On October 22, 2015, the state filed a motion in limine to preclude the defendant from introducing testimonial evidence of Bridgeport Police Officer Mark Martocchio and Marshall Robinson from the state forensic laboratory regarding the recovery of a firearm from Clark upon his arrest on August 23, 2014. Specifically, the state argued that the proposed third-party culpability evidence was not relevant, as the weapon was not found in Clark's possession until almost one year after the crime. The court took up the motion in limine, stating that it understood that the defendant wanted to present the testimony of Martocchio, who would testify that he recovered the weapon from Clark on August 23, 2014, and Robinson, who would testify that the shell casings in evidence were discharged from the weapon found in Clark's possession. Defense counsel argued that the evidence was "fundamentally relevant to our defense" in that the weapon was not found in the defendant's possession or tied to him in any way. The state responded that it understood the claim of relevancy to be with respect to third-party culpability and argued that the evidence was not relevant because it lacked a direct connection. Clark's name previously had never come up during the trial, and thus there was no indication that he was present at the scene of the crime. The court rejected defense counsel's argument that the delay in finding the weapon went to the weight of the evidence, not its admissibility. Granting the state's motion in limine, the court stated that it was concerned about the "fundamental relevance" of the evidence and questioned how it

could assist the jury in determining the issues in this case.

We note at the outset that the defendant did not challenge before the trial court the state's view of the evidence as purported third-party culpability evidence. In fact, defense counsel noted during oral argument before the trial court: "As [the state] recognizes, we haven't submitted, *which, we intend, a third-party culpability instruction,* particularly as to Mr. Clark." (Emphasis added.) In its brief to this court, the state argued that the trial court "properly excluded the proffered testimony as irrelevant to establish third-party culpability." The defendant did not file a reply brief. During the rebuttal portion of his oral argument before this court, the defendant represented that he had not offered the evidence to show third-party culpability, but rather to show simply that the gun was found in the possession of a third party and was not connected to the defendant.

The trial court clearly found that the proposed evidence was not relevant to the issues in the case. Given that the "admissibility of evidence of [third-party] culpability is governed by the rules relating to relevancy"; (internal quotation marks omitted) *State* v. *Schovanec*, 326 Conn. 310, 319, 163 A.3d 581 (2017); the court was not required to proceed further in its analysis, whether the court understood the claim to be one of general relevance or one in furtherance of a defense of third-party culpability. "Determining whether evidence is relevant and material to critical issues in a case is an inherently fact-bound inquiry. . . . As a general principle, evidence is relevant if it has a tendency to establish the existence of a material fact. One fact is relevant to another fact whenever, according to the common course of events, the existence of the one, taken alone or in connection with other facts, renders the existence of the other either certain or more probable." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 107 Conn. App. 685, 710, 946 A.2d 294, cert. denied, 288 Conn. 904, 953 A.2d 650 (2008).

"Although the standard for relevancy is quite low, it is often applied with some rigor. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . The determination of relevance must be made according to reason and judicial experience." (Citations omitted; internal quotation marks omitted.) *State* v. *Thomas*, 177 Conn. App. 369, 395–96, 173 A.3d 430, cert. denied, 327 Conn. 985, 175 A.3d 43 (2017). "[T]he trial court's ruling on the relevancy of . . . evidence will be reversed on appeal only if the court has abused its discretion or an injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Rodriguez*,

supra, 107 Conn. App. 710.

The defendant argues that because the sole issue before the jury was "whether or not the defendant was one of the shooters," the proffered evidence was "relevant to show a lack of identity as to the defendant." We disagree. The trial court reasonably could have concluded that the fact that the weapon was found in the possession of a different individual on August 23, 2014, almost one year after the crimes at issue, did not render it "either certain or more probable" that the defendant was not one of the shooters on September 10, 2013. See *Sullivan* v. *Metro-North Commuter Railroad Co.*, 96 Conn. App. 741, 749, 901 A.2d 1258 (2006) (report, offered "to support the plaintiff's contention that the decedent's death was foreseeable to the defendant on the basis of its knowledge of the statistical data contained in the report concerning reported crimes at Connecticut [railroad] stations," was not relevant in part because it was based on data compiled from 1985 through 1987, and decedent's death did not occur until 1992), rev'd on other grounds, 292 Conn. 150, 971 A.2d 676 (2009); *State* v. *Skidd*, 104 Conn. App. 46, 63, 932 A.2d 416 (2007) ("[T]he court properly ruled that the map was not relevant because it did not depict the parking lot as it existed in July, 2003. The court correctly determined that the inferences that could be drawn from the map would be relevant only if the events had occurred in 2001, when the map was created, and were not relevant to the incident of July, 2003."). Accordingly, we conclude that the court did not abuse its discretion in concluding that the proffered evidence was too remote in time to be relevant to show a lack of identity.[14]

### IV

The defendant's final claim is that the court abused its discretion in admitting consciousness of guilt evidence that "on two occasions after the shooting, [the] defendant did not appear in court on an unrelated matter."

The following additional facts and procedural history are relevant to this claim. Prior to September 17, 2013, the defendant had scheduled court dates in Norwalk Superior Court on matters unrelated to the shootings. On September 17, 2013, one week after the shootings, the defendant was driving a motor vehicle in Bridgeport when he was involved in an accident. He left the scene of the accident before police arrived. Detective Martin Heanue of the Bridgeport Police Department responded to the accident and collected evidence from the vehicle, including the defendant's cell phone, two criminal appearance bonds for cases unrelated to the shootings, and a gun. Heanue learned the phone number of the cell phone, and applied for a search warrant for the call detail records. Heanue eventually identified the driver of the vehicle as the defendant.

Before Heanue had testified to his investigation of

the accident, the state had sought to introduce evidence that the defendant had failed to appear for two court dates in Norwalk as consciousness of guilt evidence, and defense counsel objected on the ground of relevance. In argument outside the presence of the jury, the state claimed that the two criminal appearance bonds found in the vehicle showed that the defendant had notice of the Norwalk court dates. Defense counsel responded to the state's argument by positing that the defendant had not appeared in court because he knew that the police had recovered a gun from the vehicle and that the police were investigating him in connection with that gun. Defense counsel further argued that he was put in an "impossible position" because he did not want to introduce the evidence about the gun.

The court, recognizing that the jury had not yet heard any connection between the appearance bonds and the car at issue, ruled that the appearance bonds could not yet be admitted as full exhibits, but advised that assuming the state could provide the connection, the criminal appearance bonds would be admissible subject to redaction of the listed offenses. The court further stated: "I understand that the defense has another argument they could put forward but simply because he can't put that argument forward, I don't think that the state is precluded from asking the jury to infer that he did not appear and argue later that the reason he did was because of his implication in a shooting that occurred days before." The court indicated that defense counsel could renew his objection when the state later moved to admit the appearance bonds into evidence, and the court would reconsider its ruling if there was reason to do so.

On October 22, 2015, the state and defense counsel alerted the court that they had reached an agreement regarding the defendant's failures to appear for his court dates. Defense counsel again noted that she objected to the evidence coming in at all as "unduly prejudicial and not probative of anything that is pertinent to this case, particularly given the lapse in time between the incident . . . and the date that [the defendant] didn't appear." Defense counsel further argued that defense counsel in the unrelated proceedings had not notified the defendant of one of the two court dates. After putting those arguments on the record, the state and defense counsel requested, in the presence of the jury, that the court take judicial notice of the following facts.[15] On September 11, 2013, and September 16, 2013, the defendant was scheduled to appear in Norwalk Superior Court and he did appear on both of those dates. The defendant was scheduled to appear in court on October 2, 2013, but he failed to appear on that date. He was scheduled to appear in court on October 9, 2013, on which date the defendant again failed to appear, and he was ordered rearrested. The defendant was arrested and taken into custody on October 17, 2013. The nature

of the charges at issue in the Norwalk proceedings was not disclosed to the jury.

The court agreed to take judicial notice of the facts represented and instructed the jury that these matters were unrelated to the shootings, and that the jury was to draw no adverse inferences against the defendant. The court explained that the facts were not offered to show that the defendant is a person of bad character. In its final charge, the court instructed the jury as to consciousness of guilt evidence and stated that the "state claims that in October, 2013, after the shootings in Bridgeport, [the defendant] allegedly did not appear for an unrelated case he had in Norwalk."[16] Defense counsel took an exception to the instruction "for reasons previously stated that are unduly focusing on a piece of notice and it being too attenuated to the crime."[17]

On appeal, the defendant claims that "there was simply no basis for concluding that defendant's failure to appear in court in Norwalk was motivated by an attempt to evade apprehension for the shooting." In support of this claim, he argues that: (1) there was no evidence that the defendant was under investigation at the time or that he was aware he was under investigation; (2) the court was aware that the police had found a gun in the car when he fled the scene of the accident; and (3) the court was aware that the transcript of the October 9, 2013 proceeding showed that the defendant did not have notice of that court date. We are not persuaded by the defendant's arguments.

We begin our analysis with a review of the applicable legal principles. "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Coccomo*, 302 Conn. 664, 669, 31 A.3d 1012 (2011).

"In a criminal trial, it is relevant to show the conduct of an accused, as well as any statement made by him subsequent to the alleged criminal act, which may fairly be inferred to have been influenced by the criminal act. . . . Generally speaking, all that is required is that . . . evidence [of consciousness of guilt] have relevance, and the fact that ambiguities or explanations may exist

which tend to rebut an inference of guilt does not render [such] evidence . . . inadmissible but simply constitutes a factor for the jury's consideration. . . . The fact that the evidence might support an innocent explanation as well as an inference of a consciousness of guilt does not make [the admission of evidence of consciousness of guilt] erroneous. . . . [T]he court [is] not required to enumerate all the possible innocent explanations offered by the defendant. . . . [I]t is the province of the jury to sort through any ambiguity in the evidence in order to determine whether [such evidence] warrants the inference that [the defendant] possessed a guilty conscience. . . . Moreover, evidence of a defendant's consciousness of guilt is admissible only if its probative value outweighs its prejudicial effect." (Citation omitted; internal quotation marks omitted.) *State* v. *Gonzalez*, 315 Conn. 564, 593–94, 109 A.3d 453, cert. denied, U.S. , 136 S. Ct. 84, 193 L. Ed. 2d 73 (2015).

"We review a trial court's evidentiary rulings for abuse of discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Citation omitted; internal quotation marks omitted.) Id., 593.

Applying these principles to the present case, we conclude that the defendant's failure to appear on two dates following the shootings "may fairly be inferred to have been influenced by the criminal act" of causing the death of one person and the assault of four others. (Internal quotation marks omitted.) *State* v. *Coccomo*, supra, 302 Conn. 671. The jury reasonably could have inferred that the defendant's failure to appear for his court dates indicated consciousness of guilt in the multiple shootings. See *State* v. *Davis*, 98 Conn. App. 608, 626–30, 911 A.2d 753 (2006) (jury reasonably could have inferred that evidence that defendant had complied with terms of his parole and attended monthly meetings with his parole officer prior to shooting but missed meetings after shooting indicated consciousness of guilt), aff'd, 286 Conn. 17, 942 A.2d 373 (2008), overruled in part by *State* v. *Payne*, 303 Conn. 538, 549, 34 A.3d 370 (2012). Although that was not the only possible explanation for the defendant's conduct, "[t]he fact that the evidence might support an innocent explanation as well as an inference of a consciousness of guilt does not make [the admission of such evidence] erroneous." (Internal quotation marks omitted.) *State* v. *Coccomo*, supra, 672.

We further conclude that the evidence was not more prejudicial than probative. Our Supreme Court "has identified four factors relevant to determining whether the admission of otherwise probative evidence is unduly

prejudicial. These are: (1) where the facts offered may unduly arouse the [jurors'] emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) *State* v. *Hill*, 307 Conn. 689, 698, 59 A.3d 196 (2013). "[A]ll adverse evidence is [by definition] damaging to one's case, but [such evidence] is inadmissible *only if* it creates *undue* prejudice so that it threatens an injustice were it to be admitted." (Emphasis in original; internal quotation marks omitted.) *State* v. *Coccomo*, supra, 302 Conn. 673.

In the present case, the facts of the failures to appear do not rise to the level of prejudice identified in any of the four factors. In his brief to this court, the defendant argues only that he was prejudiced because "the evidence created side issues that unduly distracted the jury from the main issue." We disagree. There is nothing in the record to support the defendant's argument that the court's taking judicial notice of the failures to appear created an unduly distracting side issue. Furthermore, no significant amount of time was expended on this issue, which was brief in the context of a trial that spanned more than ten days.

We further reject as contrary to our case law the defendant's argument that the evidence was improperly admitted because there was no evidence that he was under investigation for the shootings at the time or that he was aware he was under investigation. See *State* v. *Hill*, supra, 307 Conn. 700–702 (rejecting claim that evidence defendant fled from police when they tried to stop his vehicle "prior to the issuance of an arrest warrant and before the police were actively searching for [the defendant] in connection with the . . . shootings" was not probative of consciousness of guilt). "[T]he state is not required, as a matter of law, to establish that the defendant had actual knowledge that he was being charged with a criminal offense before introducing evidence of his flight." (Internal quotation marks omitted.) *State* v. *Barnes*, 112 Conn. App. 711, 730, 963 A.2d 1087 (2009) ("[t]he court properly [allowed] the state to present evidence of the defendant's flight even if the state failed to introduce direct or inferential evidence that the defendant knew that he was wanted by the police" [internal quotation marks omitted]); see also *State* v. *Holmes*, 64 Conn. App. 80, 87, 778 A.2d 253 ("the state was not required to show that the defendant had knowledge that the police were actively looking for him for the evidence of flight to be introduced to the jury to infer consciousness of guilt"), cert. denied, 258 Conn. 911, 782 A.2d 1249 (2001). In any event, the jury heard evidence that on September 16, 2013, Rogers

was arrested and had sent the defendant a text message indicating that "[d]ey taken [me]." From this evidence, the jury reasonably could have inferred that the defendant was aware that the police might seek him out in connection with the shootings.

We also reject the defendant's argument that the jury could not reasonably have concluded that he failed to appear because he had a guilty conscience as to the shootings. The defendant maintains that he actually failed to appear because the police found a gun that he illegally possessed in the car that he owned and that he fled following the accident. The defendant chose, as a matter of trial strategy, not to present this alternative explanation to the jury because he concluded that the evidence regarding the gun was damaging. Had he chosen to present his explanation, the jury reasonably could have inferred that the defendant failed to appear because of the presence of the gun in the car he was operating, but it was also entitled to make contrary inferences. See *State* v. *Watts*, 71 Conn. App. 27, 36, 800 A.2d 619 (2002) (evidence that the defendant procured false identification badge, which defendant claimed he used in another incident, unrelated to charges at issue, was properly admitted as consciousness of guilt evidence, where "[e]ven if the jury reasonably could have inferred on the state of this record that the defendant had used the identification badge *exclusively* in an unrelated activity, it was entitled to make contrary inferences" [emphasis in original]).

Last, regarding the defendant's argument that the court was aware that the transcript of the October 9, 2013 proceeding showed that the defendant did not have notice of that court date, we conclude that the defendant has not demonstrated that the evidence was improperly admitted on this basis. In the transcript of the October 9, 2013 proceeding, defense counsel represented that he had "not spoken to" the defendant and that he "did reach out" but had not "heard from him." Notwithstanding that the state and defense counsel requested that the court take judicial notice of the defendant's court proceedings in Norwalk rather than introducing the transcripts of those proceedings into evidence, even if the court were to consider the representations of defense counsel during the October 9 proceeding, the transcript does not compel the conclusion that the defendant did not have notice of the court date. Accordingly, we cannot conclude that the court abused its discretion in admitting consciousness of guilt evidence of the defendant's failure to appear in court.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] See *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998).Following our Supreme Court's decision in *State* v. *Edwards*, 325 Conn. 97, 156 A.3d 506 (2017), the defendant filed a supplemental brief setting forth this claim.

[2] One of the victims, Aijholon Tisdale, understood Rogers and the defen-

dant to be showing disrespect by calling them "a Brazzie" because that is what they call people from the east end of Bridgeport.

[3] The court previously had granted the defendant's motion to sever the count of criminal possession of a firearm from the state's long form information. The state later entered a nolle prosequi as to that count.

[4] The jury also found Rogers guilty of the same offenses: one count of murder in violation of § 53a-54a (a), one count of conspiracy to commit murder in violation of §§ 53a-48 (a) and 53a-54a (a), and four counts of assault in the first degree in violation of § 53a-59 (a) (5). Rogers and the defendant have appealed separately. See *State* v. *Rogers*, 183 Conn. App. 669,    A.3d    (2018).

[5] We note that Weaver initially testified during the hearing on the defendant's motion in limine that Sprint PCS sent him the wrong set of tower information. During his testimony before the jury, however, he stated that he had made a mistake in his earlier testimony and that Metro PCS was the carrier that sent him the wrong tower data. Accordingly, the data that Weaver downloaded from the NCADC database in the form of an Excel spreadsheet corresponded to Rogers' cell phone, not the defendant's cell phone.

[6] Practice Book § 40-11 provides in relevant part: "(a) Upon written request by a defendant filed in accordance with Section 41-5 and without requiring any order of the judicial authority, the prosecuting authority, subject to Section 40-40 et seq., shall promptly, but no later than forty-five days from the filing of the request, unless such time is extended by the judicial authority for good cause shown, disclose in writing the existence of, provide photocopies of, and allow the defendant in accordance with Section 40-7, to inspect, copy, photograph and have reasonable tests made on any of the following items . . .

"(3) Any reports or statements of experts made in connection with the offense charged including results of physical and mental examinations and of scientific tests, experiments or comparisons which are material to the preparation of the defense or are intended for use by the prosecuting authority as evidence in chief at the trial . . . ."

[7] One of the slides of Weaver's presentation contained a video depicting the movement of Anderson's GPS unit. Because Weaver had e-mailed the presentation as a PDF file, however, the video was not viewable. The video could only be viewed by opening the records contained on the CDs that were never picked up.

[8] Weaver testified that coverage areas may also be mapped by hand. Weaver testified that a coverage area often extends approximately 60 to 70 percent into the next closest coverage area, [96] and therefore a more precise coverage area may be determined by measuring 51 or 61 percent into the next closest coverage area, a process Weaver described as "[v]ery difficult . . . ."

[9] We note that defense counsel had made a similar request to preclude the testimony of another of the state's expert witnesses, Heather Degnan. The court denied the motion to preclude but stated: "At the end of her direct examination I will excuse the jury for a moment and if you feel you need to renew the motion or make any other requests for relief I will hear that." At the end of direct examination, the court held a sidebar conference, after which defense counsel cross-examined Degnan. After another witness testified and the jury was excused for lunch, defense counsel put on the record a further objection to Degnan's testimony as to the ability to conduct DNA testing on shell casings.

The court then stated: "[I]n terms of the examination of Mrs. Degnan, Heather Degnan, I made my ruling before. Counsel's just putting [on] the record why she believes that ruling creates prejudice to her client. But I would say this much, too, in fairness to the court, I—I expressly said before the start of the examination of Mrs. Degnan, after I made my ruling that at the end of her testimony, direct, that I would excuse the jury and give counsel an opportunity to be heard further for reconsideration of the ruling or for any further relief. I called counsel up to sidebar, and I believe I said, correct me if I'm wrong, do you want me to excuse the jury now so you can be heard on that matter. This was at sidebar. And counsel did say no, we'll go forward with cross-examination and put it on the record at a later time what you just put on the record. . . .

"So, you know, there was no request to excuse the jury to say, Judge, we ask you to reconsider your ruling and strike the testimony, we ask for a continuance in our cross-examination of the witness so that we can look into this further. I'm just—you know, I need to complete the record, too, as to what did occur. Counsel elected to go directly to cross-examination. So, I understand your position, but I just want the record to be complete

in all respects.”

[10] As noted previously, the court first precluded one slide of Weaver's PowerPoint presentation that depicted the movement of Anderson's GPS unit, on the basis of the state's failure to provide the video to defense counsel. Thereafter, upon learning that Weaver had made changes to his presentation, the court suspended testimony for the afternoon to permit defense counsel to meet with Weaver to prepare for cross-examination.

[11] Our determination that the court did not abuse its discretion leads us to conclude further that the court's failure to grant a continuance or preclude Weaver's testimony did not violate the defendant's constitutional rights to a fair trial and to present evidence in his defense. In his brief, the defendant argues that “[t]his claim implicates his constitutional rights to a fair trial and to present a defense and, therefore, is of constitutional magnitude.” The two cases he cites involve the trial court's exclusion of evidence offered by defendants in their defense, rather than evidence offered by the state, and do not support his argument. See *State* v. *Barletta*, 238 Conn. 313, 322–23, 680 A.2d 1284 (1996) (concluding that trial court's exclusion of defendant's proffered expert testimony did not constitute error of constitutional dimension, where defendant sought to introduce expert testimony to impeach witness who had already, in her own testimony, provided jury with “substantial reason to question her reliability and credibility”); *In re Adalberto S.*, 27 Conn. App. 49, 56–57, 604 A.2d 822 (trial court deprived defendant of his right to present a defense, which was offered when it excluded evidence of alleged beating he sustained at hands of police when they apprehended him in support of his defense of justification to charge of interfering with officer), cert. denied, 222 Conn. 903, 606 A.2d 1328 (1992).

The defendant presents no authority to support his contention that the trial court's failure to preclude Weaver's testimony or to grant a continuance implicates his constitutional rights to a fair trial or to present a defense. Furthermore, this court has previously suggested that a trial court's failure to issue sanctions on the basis of a discovery violation does not implicate a defendant's constitutional rights. See *State* v. *Stanley*, 161 Conn. App. 10, 33 n.9, 125 A.3d 1078 (2015) (“[w]hether the court imposes sanctions on the state [for discovery violations] does not implicate the defendant's constitutional rights”), cert. denied, 320 Conn. 918, 131 A.3d 1154 (2016); see also *State* v. *Colon*, 71 Conn. App. 217, 241, 800 A.2d 1268 (“Where discovery concerns inculpatory evidence, there exists no constitutional right to the disclosure of such evidence and, therefore, the rules of the court regulate any such disclosure. . . . In that event, [t]he trial court has broad discretion in applying sanctions for failure to comply with discovery orders.” [Citation omitted; internal quotation marks omitted.]), cert. denied, 261 Conn. 934, 806 A.2d 1067 (2002). Accordingly, we conclude that the defendant has not shown a violation of his constitutional right to a fair trial or to present a defense.

[12] See *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998). “A *Porter* analysis involves a two part inquiry that assesses the reliability and relevance of the witness' methods. . . . First, the party offering the expert testimony must show that the expert's methods for reaching his conclusion are reliable. . . . Second, the proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract. . . . Put another way, the proponent of scientific evidence must establish that the specific scientific testimony at issue is, in fact, derived from and based [on] . . . [scientifically reliable] methodology.” (Internal quotation marks omitted.) *State* v. *Steele*, 176 Conn. App. 1, 33 n.21, 169 A.3d 797, cert. denied, 327 Conn. 962, 172 A.3d 1261 (2017).

[13] Our conclusion that the court properly precluded the evidence leads us to conclude further that the preclusion of the evidence did not violate the defendant's constitutional right to present evidence in his defense. See footnote 14 of this opinion.

[14] Our conclusion that the court properly precluded the evidence on the ground of relevance leads us to conclude further that the preclusion of the evidence did not violate the defendant's constitutional rights to a fair trial and to present evidence in his defense. See *State* v. *Davis*, 298 Conn. 1, 11, 1 A.3d 76 (2010) (“[i]f, after reviewing the trial court's evidentiary rulings, we conclude that the trial court properly excluded the proffered evidence, then the defendant's constitutional claims necessarily fail”); *State* v. *Adorno*, 121 Conn. App. 534, 547–48, 996 A.2d 746 (if proffered evidence is not relevant, right of confrontation is not affected and evidence is properly excluded), cert. denied, 297 Conn. 929, 998 A.2d 1196 (2010).

[15] The court asked the parties whether they were referring to a stipulation. The prosecutor responded that "[w]e're not asking it be designated as a stipulation, merely an agreement for the record." The prosecutor further stated: "What I mean is that the court is going to take judicial notice. In other words, [defense counsel] and I agreed that if the court takes judicial notice of the following facts that would be acceptable as a presentation to the jury." The court agreed to do so, and after counsel recited the agreed on facts before the jury, the court instructed the jury that it was "taking judicial notice of what's just been represented because they represent official court proceedings within Norwalk." The court further instructed the jury that it could accept the representations as true "without the need for offering further evidence on the matters."

[16] The court instructed, in relevant part: "Now, in any criminal trial it is permissible for the state to show that conduct or statements made by a defendant after the time of the alleged offense may have been influenced by the criminal act itself; that is, the conduct or statements show a consciousness of guilt.

"The state claims that the following conduct is evidence of consciousness of guilt . . . as to Raashon Jackson, the state claims that in October, 2013, after the shootings in Bridgeport, he allegedly did not appear for an unrelated case he had in Norwalk.

"Such acts or statements do not, however, raise a presumption of guilt. If you find the evidence proved and you also find that the acts or statements were influenced by the criminal act and not by any other reason, you may, but are not required to, infer from this evidence that the defendant was acting from a guilty [conscience]. Remember, though, that you must limit your consideration of this type of evidence to only the particular defendant against whom it is alleged.

"It is up to [you] as judges of the facts to decide whether either of the defendants' acts or statements, if proved, reflect a consciousness of guilt and to consider such in your deliberations in conformity with these instructions."

[17] Defense counsel reiterated his argument on the consciousness of guilt evidence in his motion for a new trial.